I want to thank counsel for their accommodation. I know this is an unusual rescheduled setting and I really appreciate your willingness to accommodate our time frame. First case this morning is, this afternoon is 15-1320 Tug Hill Construction v. Army. Mr. Dugdale, whenever you're ready. And before I begin, I'll also acknowledge again we've had a visiting judge, district court judge here this week and he's back again for this special session. Happy to be back. Thank you. Good afternoon. May it please the court. My name is Brian Dugdale, the law firm of Varela, Lee, Metz, and Guarino. With me, my co-counsel, Ray Muller. And I've reserved at the clerk's office two minutes for a buttolist that's acceptable to the court. Thank you. This case is about a set of circumstances that arose out of a problem between the United States Army Corps of Engineers and a set of privatized utility providers at Fort Bliss in El Paso, Texas. The set of circumstances that arose out of this relationship has been variously and I think very fairly characterized by the government as an irreconcilable conflict, an unbridgeable gap, a dilemma, and of course... Well, explicitly how? Because you couldn't get the private utilities to agree or what was the essence of the unbridgeable gap or problem? Certainly, Your Honor. And the problem dates back several years before the project. And essentially the privatization at least ostensibly transferred ownership rights from the Army to the privatized utility providers in the actual physical infrastructure on the project, the pipes, the conduits, the gas lines, et cetera. Now, that's done by contract between the Army and the privatized utility providers. Following that privatization, which took place in 2003 and 2004, the Army separately embarked on a massive construction expansion at Fort Bliss. And when I say massive, we're talking about four plus billion dollars, tripling the size of the base from 9,000 to 30,000 people. Let's go back just a little bit. When you say it privatized the utilities... I understand that that means that the U.S. government had no interest in the utilities anymore. Everything had been transferred over to the private parties. That's correct, Your Honor, with the exception that the period of transfer lasts for 50 years. And it's subject to renewal. It's also subject to modification. So if the Army, the Department of the Army, wants to take those systems back, ultimately it has a right to do so. For the time being, it has not done so. And so for the period that we're talking about, the ownership of those systems rested with the private utility providers. And the fact that it was privately owned was made entirely known to your client before they bid on this project, correct? Your Honor, the word owned was certainly used in the request for proposals. And throughout my argument, I'll describe why that term is problematic. Well, what about the special notice which says that the existing portless main post-utility systems are privately owned? It certainly does, Your Honor. It says that they are privately owned. To a contractor who is awarded work by the government, by the Army, the term owned in terms of a third party is not necessarily indicative that the contractor must take some action outside of its contract with the government in order to perform that work. But what about privately owned? I mean, that's a definite signal that it's outside of the government. Certainly, Your Honor. And I would compare the utility privatization to your home or my home. If the government hired a contractor to tear down my house and rebuild it to the government's specifications, the government would have the obligation to secure the right to do that before it could possibly expect a contractor to go and secure those rights. Yeah, but that's what Judge Stark said. We referred to the special notice. And that seems pretty clear that you were on notice that the circumstances were one where you were responsible for trying to dislodge some of the exercise or whatever, that that was your responsibility and not the government's, right? Respectfully, I disagree, Your Honor. The special notice, and this, again, goes back to a time period prior to the CAB 3 and 4 contract award. The rights of the utility providers as compared to the rights of government contractors who had been awarded work was the subject of voluminous discussions over a period of years from 2006 through 2010 and leading up until the moment of the CAB 3 and 4 task order award. Universally, during every single conversation, every analysis, every memorandum, and every email, the government internally and including in conversations with counsel and memoranda from counsel determined over and over again that the only viable alternative to solving this problem that they had, and again, the problem being the rights having been transferred and the Army not having incorporated coordination with those utility providers into its design for the expansion program, the only viable alternative for solving that dilemma was that the MATOC contractors perform work. And coordination, that term, is used over and over again in those conversations and the meaning of coordination throughout that entire time period and leading up to the award of CAB 3 and 4 was that the MATOC contractor would perform the utility system's work. That may be the case, but we're dealing here with a specific notice that went to Tug Hill and it says, typically, utility owner to remove existing utilities, install the new primary utility systems, and make the final connections. Regardless of what had been understood before, here's a special notice that seems to me to be telling you how this is going to work. Understood, Your Honor, and again, respectfully, we disagree with what that notice means. And the fact that, indeed, it does say typically, it does not say it must be performed. It does not say that the contractor must secure the right to perform the work from the utility providers. It says he must coordinate and finalize the utility work. And then it goes on to say contractors shall be responsible for negotiating and finalizing utility system work with the utility providers. Where's the ambiguity there? It doesn't say negotiate an agreement. It doesn't say subcontract to them. It says coordinate, negotiate, and finalize. And those terms in the contracting world, we would assert, are terms of art that mean something different in the context of the entire contract. So we've pulled out three separate provisions in the special notice and we've asked you about it. And you point out the ambiguities in each one of the provisions. But read as a whole, when you read that provision as a whole, isn't that putting the contractors on alert that you need to get together with the utility companies because they own the utilities and typically, most of the time, all the time, they do the work. I understand the question, Your Honor. And once again, I think that the special notice, when read in context with the entire contract, and as we've cited in our initial brief, there are many, many provisions of the contract that specifically differentiate work that the contractor would perform from work that the utility provider would perform. So you're reading this special notice as saying what to use, that you don't have to be bothered by the fact that these utility systems are privately owned and you can do whatever you want, notwithstanding the existing arrangement. Is that how you read the special notice? Certainly not, Your Honor. And Tuggy Hill does not argue that there was no responsibility to coordinate. But as we've set forth in the brief, coordination in this case, as it meant for every single discussion that the Army ever had about this issue, was to work with the utility providers to connect the new construction to the old construction, perhaps have the utility providers conduct inspections, work with them in the field as necessary to get those inspections done, but never at any point up through the award of the contract had those terms been used to require a MATOC contractor to secure the right to perform work that the government had already asked it to perform. You're couching these arguments today under the term MATOC, but really you didn't make those arguments below, did you? I mean, your arguments today have been with respect to Tuggy Hill Company, but now you're making the arguments under the MATOC label. And allow me, Your Honor, to explain my reference to the MATOC. Tuggy Hill was in a pool of MATOC contractors. Ultimately, they won the award for this particular task order under their MATOC contract. They won several other awards as well. But Tuggy Hill has a MATOC contract with the government, correct? That's correct. So, you see, there's two different contracts, and I think we're only dealing with the one between Tuggy Hill and the government. But you're trying to insert the MATOC contract and argue good faith in dealing and constructive change, but you didn't make those arguments below, did you? Your Honor, I don't think that we specifically enumerated whether good faith in fair dealing arose out of the task order versus the MATOC, but we certainly did argue that the implied covenant of good faith in fair dealing was something that was applicable and was in play throughout the period before the task order award for CAB 3 and 4. And so by implication, that means it was in play once the MATOC was executed. All of the events leading up to that... Well, you understand that if he didn't make the arguments with respect to the MATOC, then we can't entertain those arguments today. I certainly understand that, Judge. And, again, respectfully, I think that the arguments as they're presented at the lower court necessarily implicate good faith in fair dealing during the pre-task order period. We'll come back to the special notice for a moment. That first sentence that I read you about the systems being privately owned, in your view, what is added? What is the meaning of that provision of the contract? Well, Your Honor, to Sunghill, as the record shows, it certainly was something that raised their attention. They took a look very specifically at that provision. They're privately owned. What does that mean in the context of the contract award that we've already been given, where across 1,000 pages of specification, it very specifically delineates what work we do versus what the utility providers would do. And it means exactly that they're privately owned, and we have to consider it for purposes of coordination for their work, not for our work. Whatever arrangements the government may have made to secure the right to perform this contract, that's the government's obligation. The government designed this expansion program, and throughout the course of a period of years in creating this program- You say it's the government's job, but the special notice does precisely the opposite, which it's your job. It points out that typically this is what utility owners do, and that you'll be responsible for changes to that circumstance, right? Well, Judge, I think that the special notice indicates that we will be responsible for coordinating in the context of the entire contract. In other words, the work is ours, and we've got to make sure that it complies with their standards. We've got to make sure that they inspect it. We've got to work with them in the field as any contractor- But this is say coordinating. This is negotiating and finalizing. Certainly. And finalizing that work, once it's in the ground, is connecting it to the- What's negotiation then? And making it work. What's negotiating? Whatever discussions need to happen between Tug Hill and that utility provider in the field to make that work happen and turn it on at the end of the day, that's coordinating, negotiating, and finalizing that utility system's work. But there is nothing in the black and white language of that special notice that requires Tug Hill to subcontract all of the utility system's work to the utility providers. No, you might reach a better deal than that with the UPs. Nobody knows for sure. But the board found that this predicament, such as it was, was one that the government tried to outsource and your client picked it up and knowingly took it. Where's the error in the board's finding? Well, Your Honor, I think the error in the board's finding is twofold. First, with respect to constructive change, once again, Tug Hill does not read that notice to require the arrangements that ultimately were forced upon Tug Hill. The facts very clearly prove that after the award, Tug Hill didn't have any option, no self-performance, no deals with the UP to have a combination of inspections and review. It was you subcontract the work to us at whatever price we dictate. It could be $20 million, it could be $50 million. It's our work. And that circumstance is a clear departure from the coordination requirement that had long been understood by the government. Again, the only viable alternative that the government had ever come up with to solve this problem was for the MATOC to perform the work, Tug Hill in this case, and to address the problem with the utility providers internally through government channels. That did not happen here. Also, with respect to constructive change, we feel that the findings of fact were arbitrary, capricious, not supported by the substantial weight of the evidence. Eight days of trial, 625 exhibits, 16 witnesses, and the board found 25 findings of fact of which probably 15 to 18 are not in dispute. The board completely ignored the period of time following the award of the task order, which, of course, is critical to determining whether, in fact, the change occurred. There were numerous events, including the pre-construction meeting, where the utility providers effectively claimed the work and told Tug Hill, that's our work, you can't do it. Up to that point, Tug Hill had still been planning on using its own forces and subcontractors to perform the work. So that critical period is necessary to determine whether a change, in fact, occurred. Secondly, Your Honor, we believe the board clearly erred in determining that the implied covenant of good faith and fair dealing did not apply in the post-MATOC pre-task order period, as I discussed earlier. And secondly, also, with respect to the implied covenant of good faith and fair dealing, the findings of fact are, again, arbitrary, capricious, not supported by the substantial evidence. Thank you. Thank you. You've used your rebuttal time. We'll restore two minutes if you need it at the end. Thank you. Mr. Gwynne. Your Honor, may it please the Court. First off, I'd like to thank the Court. I'd like to thank Mr. Dugdale personally and Mr. Dugdale's client, Tug Hill, for their accommodation in this matter. Your Honor, most of the points I was going to make have already sort of been discussed by the Court. Well, let me ask you, is it a fair reading? What is your reading, bottom line, starkly? What does the special notice provide? Does it say, look, these utility systems are privately owned. Unless you can get these guys to give something up, you're sunk, and you better include that in the costs of what's going on here. Is that the essence? I think that is absolutely the essence of it, Your Honor. I would say there is an interplay, I think, that is important. Instead of just looking at the five sentences alone, there's an interplay of the sentences. And in particular, I think the middle sentences, the typical requirement, in other words, what the government is doing here is putting out a sort of basic scenario of what the government thinks would happen. And then it uses the phrase, however, tying back to that typically sentence, to allow the contractors, the bidders, to make their own private arrangements. And then the final sentence puts the contractor on notice that they need to include the costs of those coordination arrangements, those negotiation arrangements, those finalization costs. But read in its entirety, does it not convey the impression that all of this stuff is up for grabs? I would say, Your Honor, it allows for, it is essentially the government saying all of the information that it has without speculating on possible relationships that the bidders could enter into with the utility. So, I think that's right. I would not use the term up for grabs, but I would say it permits a broad spectrum of potential arrangements. But it allows the bidders to include those costs in their bid. Isn't there evidence in the record that the government did actually know more, though, than it disclosed in the special notice? Didn't it know that the UPs were probably not going to allow the self-performance by whoever bid on this contract? I think the key to that is the word probably that you used in the question, Your Honor. I think there is evidence in the record, and there is evidence that Tug Hill was also on notice, that the sort of base position that these utility providers were going to have was that they were going to do all the work. But I think it would be speculation on the part of the government. I don't know how to have made this special notice more clear without entering into the world of speculation. If we had added a sentence that says the utility providers may claim their rights, I actually think that's pretty much covered by the typically sentence where it sets forth. How about something like utility owners will assert the right to remove existing utilities or something that is stronger in the language other than typically, which means sometimes. I think it's possible that the government could have done that, but I think then that sort of changes the government's approach to this and the part that is codified by that however sentence. What the government was allowing the bidders to do was to enter into their own universe of arrangements, and that may not necessarily involve the utility providers. I see that that's what you would like for them to do, but why kind of hide the ball here? Why not tell them up front this is what needs to be done, or this is the only way it can be done? Well, I would say, Your Honor, that I wouldn't say it's hiding the ball. What I would say is this is really the extent of what the government knew without getting into a sort of contemplating further actions. In addition, Tug Hill... If you issue the special notice with this limited knowledge that you're talking about, or you can only inform so far or in some limited basis, then why are you holding Tug Hill to understanding something that you do not want to explain or that you do not understand or that you cannot explain? Well, no, I wouldn't say that. I would disagree with that characterization, Your Honor, but I would say that it's not that we couldn't explain it. First of all, we think the special notice very clearly explains that. The first sentence talks about the private ownership, and the second sentence specifically says this scope of work includes those negotiations. To say it's possible that the utility providers, or we give it some amount of level of certainty that the utility providers will assert these rights, I think not only goes too far, but it just doesn't convey accurately what the government's position was. Well, what was the government's position? I mean, you knew that... You argued in part that Tug Hill should have known that they were going to have to deal directly with the utilities. And on another part, you argue, we're not sure what Tug Hill should have done or what would have played out. I don't think it's that. I think the government's position is that Tug Hill had the freedom to negotiate some deal other than what we would have considered at the time the typical deal. No, they didn't have the freedom to negotiate with parties other than the UPs, correct? Correct, Your Honor. Okay. They didn't have that freedom. That's correct, Your Honor. And what would have happened if the UPs refused to negotiate and just decided there's an opportunity to gouge Tug Hill? Then what? Well, I think it's... I wouldn't go for speculation in this case, but then I would assume that if there was some sort of impossible impasse, then there may have been some kind of a... You know, Tug Hill would have some sort of claim, but there wasn't in this case. Didn't they come to you all and you said your only option, your sole remedy, I think, is to negotiate with the UPs and just kind of government washed its hands of it? That's correct, Your Honor. We said the only option was to continue to negotiate with the UPs, but that's also because that is within exactly... Why didn't you say that in the notice? Your only option is to negotiate with the UPs who will do all of the work. I would say, Your Honor, that I think that's very much what the special notice does say. It doesn't use those specific language, but it says this scope of work includes coordinating project utility requirements with the owners of the privatized utility systems. And I think that puts them on more than enough notice that those were the people to whom they had to negotiate, to whom they had to coordinate, and to whom they had to... Maybe this is completely off base, and I'm not going to go with numbers because I'm not sure what's confidential and what's not confidential anymore. But when you got the bids, there was a major discrepancy between the bids that you got. And the bid that was ultimately awarded, as I understand, was far lower. Didn't the government get that maybe these people aren't construing what we think the lay of the land is? No, Your Honor. And it's not in our pleadings, but in the pleadings below, it notes that there were three bidders. I believe that either all three or two of them were within the range of the government's estimates, so they were acceptable. And out of that, none of the three bids included any costs for coordination. So, we didn't know. And then further, I think the government would say, there's some element of allowing for risk in this. Tug Hill, as a bidder, is free to bid to this at whatever value they want, knowing that this is a fixed delivery contract and that they assume the risk for any cost overruns. Well, that's what raises questions, because you assume that in context of fear dealing and goodwill, everybody takes risks, but you make the assessment based on the same information. And that's, I guess, why we're here. That's correct, Your Honor. I would add another note that there's some discussion about sole source and the issue of private utilities. And around that language, it's not only the special notice that points out that this is a contractual arrangement whereby the bidder must respect existing property rights. The FAR includes a provision about that, and that provision was actually part of this contract. It's the Permits and Responsibilities Clause, FAR 52.236-7. So the idea that this is some sort of particularly unusual arrangement whereby a bidder or a contractor has to deal with other people's private property, I think the Court pointed out correctly, you do that sometimes when you do construction on your own house, but it's also true that that's not a particularly unusual arrangement in the term of government contracts. As for the, Your Honor, I pointed out the MATOC contract distinguished point. And on those grounds, I will say none of Tug Hill's briefs, their claim to the contracting officer, and nothing in any brief until here, until before this Court, did anything but refer to the contract the way they defined it as the 3-4 contract, the CAB 3-4 contract, the later contract. And so we would argue that they do not have a valid case before this Court because they brought it up at no previous stage. If we don't find that argument waived, that is the implied covenant under the MATOC, what does the record show? How could we affirm the Board on that? If you do not find that... If we reach the merits of their implied covenant argument that they're now making. Well, Your Honor, I would say there is also no allegation around any duty that would have attached under the MATOC. There's no duty that Tug Hill points to that would have included any more disclosure than what was disclosed in the plain language of the special notice. It's true. I think what Mr. Dugdale points out is that the Corps of Engineers thought about how to handle this arrangement and they contemplated alternate possibilities. There were previous CAB contracts and those contained different arrangements with how to deal with the utility providers. So why wouldn't the implied covenant, if it existed as early as the MATOC, have required the government to disclose some of that internal thinking or at least even call out more clearly than they did? There's a problem here. There's a soup sandwich, whatever it is. We're offering it to you rather than be a little more coy about it. And I would argue the point we point out when we dispute the sort of language that Tug Hill used was that it was a challenge. It was the kind of contractual arrangements that happen all the time. It was the things that happen in government contracting all the time. They deal with issues like this or issues that are just as difficult as this. And it's almost the idea that the government would have to disclose alternate arrangements that it contemplated in making the contract, particularly here where the actual arrangement is very clear and places responsibility squarely on the contractors, I think goes far beyond any kind of duty of good faith and fair dealing, particularly that that would have accrued under the MATOC because the MATOC is simply about selection of the appropriate contractor. There's nothing in the MATOC that would imply a duty of good faith to reveal items about utility providers. Utility providers are specifically an item that's contemplated in the CAB 34 contract. I would say as far as actions that happened from the execution of the CAB 34 contract and up until Tug Hill's agreement with the contractors, the items that Tug Hill talks about as being facts that were not included by the board, those are covered in pages 28 to 31 of Mr. Dugdale's brief. And none of those facts were required by the board because the board found a plain language requirement or the board found that the special notice was clear. But the items that Mr. Dugdale talks about are a meeting wherein the utility providers asserted their rights. Well, there's no need to have findings of fact on that because those rights are exactly what's contemplated by the special notice. So it would be our position that the board did not err in not including facts and they clearly found enough facts to support their holding. And for those reasons, Your Honor, we respectfully request that you affirm the opinion of the board. Thank you. Whenever you're ready. Thank you, Your Honor. Two minutes left. Briefly, Your Honor, three points in rebuttal. First, with respect to Your Honor's question as to why the government was not more clear. Why did the government hide the ball? I'd remind the court that there was a previous version of the special notice prepared by the Army's project manager. And that version of the special notice was very explicit and mandated that the winning bidder would subcontract the work to the utility providers. That version was sent to the Office of Counsel, it was rejected, and it was revised. The reason it was revised is because mandating that a contractor use a particular subcontractor is effectively a sole source requirement and it's prohibited under the FAR. Nonetheless, the project manager, Mr. Wallace, testified in his deposition, which is part of the record, repeatedly that that special notice that was actually issued was a crystal clear sole source requirement. Likewise, the contracting officer issued her decision in part on the basis that the special notice was a sole source requirement. Now, that's, according to Tug Hill's position, quite different than what it actually meant, but that's how it was enforced during the project, a sole source requirement. Now, and at the Board, the government has essentially crafted a new meaning for the special notice that it was not actually a sole source requirement, but it was something, some form of a hybrid, some form of a negotiation where maybe you could do it, maybe we could do it, but it's not an illegal sole source. And from Tug Hill's perspective, that's the key to this change argument. The special notice did not require use of the UPs, but in practice it was enforced as a sole source. Secondly, there is adequate evidence in the record that the government knew, unequivocally, that Tug Hill had not spoken substantively with the utility providers prior to submitting its bid. And thirdly, with respect to permits, this is entirely distinguishable. This is not a ministerial process of obtaining a permit. This is dealing with ownership rights. For these reasons, I guess that the Court reversed the Board's decision. Thank you. Has all the work been completed? Yes, Your Honor. So if we were to find in your favor, basically, you're looking for an $11 million refund, reimbursement? That's correct, Your Honor. Essentially, Tug Hill came out of pocket to pay the utility providers to perform the utility system's scope of work. And they accomplished that work and, in fact, performed quite well on the project. There's no issues there. It just cost substantially more than anticipated based on the involvement of those utility providers. Thank you. We thank both counsel. The case is submitted. And that concludes our proceedings for this afternoon. All rise. Now the Court's adjourned for today.